HAROLD BEAM AND JOHN J. KNODEL, PARTNERS, TRADING AS BEAM-KNODEL COMPANY, PLAINTIFFS-RESPONDENTS, v. HENRY KENT AND ROBERT E. EISNER, PARTNERS, DOING BUSINESS AS KENT METAL & CHEMICAL WORKS, DEFENDANTS-APPELLANTS.

Argued October 31, 1949—Decided December 5, 1949.

*Mr. Thomas L. Morrissey* argued the cause for appellants (*Mr. Patrick A. Dwyer* on the brief. *Messrs. Carpenter, Gilmour & Dwyer,* attorneys).

*Mr. William H. Osborne, Jr.,* argued the cause for respondents (*Mr. Alfred R. Becker* on the brief. *Messrs. Pitney, Hardin & Ward,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. Assuming it was prejudicial, did the trial court err in denying the appellants' motion to strike the opinion testimony of the respondents' expert upon the

ground that it was based partly upon hearsay? This is the only question presented by the appeal, which comes here on our own certification.

A jury in the Superior Court, Law Division, Bergen County, awarded the respondents a verdict of $15,184.79 in a contract action for the unpaid balance of the purchase price of six electrical generators and equipment. The appellants admitted the purchase of the items in question but contended the generators completely failed, from the time of their delivery, to conform to the requirements of the contract and counter-claimed for the expenses incurred in overhauling, redesigning and repairing the generators.

The appellants manufacture cerium metal by a process of electrolysis, electricity being transmitted from the electrical generators to the cerium by means of a carbon electrode which is suspended in the cerium pot. The cerium melts and boils and creates a turbulence as it splashes and surges around in the containers, the electrical circuit being repeatedly broken. The sudden and constant interruptions of the electrical circuit effect a tremendous electrical and magnetic shock to the generator, physically evidenced at the point where the revolving commutator and the brushes meet. Unless the generator is constructed in a way to compensate for the sudden breaks in the circuit, there is excessive and destructive sparking at the brushes, resulting in roughing and wearing of the commutators. If the generator armature is properly wound, the generator will remain stable and will not be much affected by the making and breaking of the circuit.

The manufacturer of the equipment, the Hanson-Van Winkle Munning Company, by letter, furnished the appellants a quotation on its 2,000 ampere 7-40 volt generator and, on its understanding of the appellants' requirements, recommended this particular one. The manufacturer's representative, who inspected the appellants' plant, also represented the respondents and was "working in connection with" them. There is ample evidence that the sellers understood the generators were to be fit for use in the purchasers' electrolytic process.

The appellants ordered the generator sets which they specified were to be in accordance with the oral representations made by the respondents and they were put into operation in January of 1947. It is contended they failed to perform properly from the start and, as a result, a crew of repairmen furnished by the manufacturer had endeavored to discover and correct the trouble. There was testimony that excessive sparking of the commutators at the point of contact with the brushes resulted in pitting and burning of the commutators and destruction of the brushes. It was indicated this trouble was traceable directly to the intermittent breaking of the circuit three to four times per second as the cerium surged in the pots, and the issue was whether or not the generators were suitable for the appellants' particular use and whether the respondents had warranted them to be fit for that purpose.

The manufacturer's chief engineer suggested that chlorine fumes were responsible for the difficulty encountered and, in an effort to support this theory, Dr. Herbert C. Roters, an expert witness, was produced in rebuttal. He had been called in by the respondents in June, 1948, while the suit was pending, to examine the generators while in operation at the appellants' plant. He inspected the plant conditions and the maintenance of the generators, observed the commutators and brushes, the sparking, the wear of the commutators and the voltage drop, and "specifically examined the machines." On the stand, he outlined to the jury the plant's ventilating system and mentioned the copper chloride content of the residue he had removed from the commutators. The effect of the sparking he minimized by referring to it as "light pin point sparking" and as "not generally considered destructive."

The witness, on direct examination, was asked how he went about his study and what conclusions he reached. He replied:

"I went about it this way. I was furnished by the Hanson-Van Winkle Munning Company complete data on that machine. They told me the dimensions of every iron part, how thick the yoke was, how long it was, what kind of steel it was made of, how the field poles were made, what kind of steel, the number of turns of wire on the field poles, and the size of that wire, and the diameter of the armature—that part you see there—the number of slots in it, how big the

slots were, the kind of wire they put in the slots, the kind of commutator they use, and the number of bars. In other words, I received complete structural information."

His testimony is quite voluminous and in the record covers some thirty pages. Admittedly the witness qualified as an expert and at the conclusion of his cross-examination counsel for the appellants moved "to strike out all of the testimony of the doctor because it is predicated on something outside of this case and he is an expert witness and he must get all of his opinion from what he found himself." Considering the motion, the court observed it was rather broad and, upon being further pressed by counsel, said:

"It is a broad motion. I don't think I will grant it. Now, if you will point out any particular testimony, or if you will by examination elicit any particular piece of testimony as based upon information obtained from this firm of Hanson-Van Winkle I think your motion should be granted, but I mean this witness has testified at great length, on a great many subjects, and I think it is obvious that some of them are the result of his own studies and calculations."

Counsel still insisted the opinions expressed by the witness were based in part upon hearsay. The court thought otherwise and by interrogation of the witness proved quite conclusively, as the record indicates, that the witness on numerous occasions had given answers which were not based upon hearsay information but upon facts within his own knowledge and on his own studies and observations. Counsel still maintained his same attitude in reference to the motion to strike, whereupon the court said:

"Well, I will deny your motion, giving you, however, the privilege of pointing out any detailed opinion, or any particular opinions that the doctor has given which are based upon hearsay and which should be stricken for the reasons you mentioned."

Counsel did not cooperate or see fit to accept the invitation of the court in pointing out the particular testimony which was objectionable but concluded the incident by saying:

"I don't want to press it further, but I would like to have my objection noted."

■ The opinions and conclusions of experts must be based either upon facts within their own knowledge which they detail to the jury or upon hypothetical questions embracing facts supported by the evidence and relating to the particular matters upon which the expert opinion is sought, which facts, for the purpose of the opinion, are assumed to be true.

A situation similar to the one developed in the case *sub judice* was encountered in *Leech v. H. & M. R. R. Co.*, 113 *N. J. L.* 366 (*Sup. Ct.* 1934) ; affirmed, 115 *N. J. L.* 114 (*E. & A.* 1935), where a physician testified to a physical examination which he made of the plaintiff and his conclusions thereon. On cross-examination, it appeared that he had based his general conclusions partly on the objective symptoms to which he had testified and partly on information he had received from the plaintiff while conversing with her. Counsel moved : "I ask that his testimony be stricken." The trial court denied the motion and the Supreme Court, on review, upheld its action on the ground that the motion "was too broad, as it included all the testimony, and some of it at least, viz., that relating to objective symptoms, was clearly competent."

Likewise in *Rolfe v. Fingerhut*, 98 *N. J. L.* 894 (*E. & A.* 1923), the court said :

"The next point is that the court refused to strike out testimony upon the ground that it was hearsay. The defendant had brought out by cross-examination that there was a conversation between the two brothers, the plaintiffs, after' they had left the presence of the [defendant]. The defendant then moved to strike out all of that testimony, including matters clearly not hearsay. If the defendant wanted any part of the evidence stricken out upon the ground that it was hearsay, it was his duty to indicate it with particularity."

■ Here counsel failed to indicate with any degree of particularity the testimony he was endeavoring to have stricken even though the court on two different occasions suggested the relief asked for would be granted if counsel would point out "any detailed opinion or any particular opinions that the doctor has given." Under these circumstances we find no error in the record.

■ There is another reason, not advanced by either party, why there should be an affirmance. The record shows the objection to Dr. Roter's testimony was not timely since the hearsay nature of it was revealed on direct examination and the motion to strike was not made until the end of the cross-examination.

"The rule is established that counsel cannot take the chance of testimony making in his favor, and if it happens to be adverse, then interpose his objection. There is nothing to show that the defence here was not apprised of the point upon which the witness was about to speak, before his testimony relative to the sale to himself was delivered. The testimony being so in without objection, it cannot be said that the court erred in not striking it out." *Clark v. State*, 47 *N. J. L.* 556 (*E. & A.* 1885).

In *Willett v. Morse*, 71 *N. J. L.* 104 (*Sup. Ct.* 1904), the court, citing the rule, said:

"It is too late to make an objection to the admission of testimony after it has all been given and is in the record. Objections must be timely, and must be made to the question."

The judgment is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—Justice HEHER—1.